UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

N⁰ 09 Civ. 9623 (RJS)

IN RE WORLDCOM, INC., *ET AL.*

WORLDCOM, INC., *ET AL.*,

Debtors-Appellees,

VERSUS

THE WALDINGER CORP.

Creditor-Appellant.

OPINION AND ORDER
April 18, 2011

RICHARD J. SULLIVAN, District Judge:

Waldinger Corporation ("Waldinger" or "Appellant") brings this bankruptcy appeal pursuant to 28 U.S.C. § 158(a), challenging (1) the March 19, 2008 Order of the Honorable Arthur J. Gonzalez, Bankruptcy Judge, reclassifying Waldinger's Claim against Appellees-Debtors WorldCom, Inc., and its subsidiaries ("WorldCom" or "Appellees") as unsecured, and (2) Judge Gonzalez's October 16, 2009 Order calculating Waldinger's award for *quantum meruit*. For the reasons set forth below, the March 19, 2008 Order is affirmed in its entirety, and the October 16, 2009 Order is affirmed in part and modified in part.

I. BACKGROUND[1]

A. The Underlying Dispute

Waldinger is a construction company that provided materials and services to WorldCom in connection with a building owned by WorldCom in Omaha, Nebraska named the Mid-Continent Data Center (the "Data Center"). The Data Center housed multiple computer systems and data storage

---

[1] The Court presumes the parties' familiarity with the factual background, as set forth fully in and taken from *In re WorldCom, Inc.*, 382 B.R. 610, 614-20 (Bankr. S.D.N.Y. 2008) and *In re WorldCom, Inc.*, No. 02-13533 (AJG), 2009 WL 2959287 (Bankr. S.D.N.Y. Aug. 18, 2008). The facts are not disputed unless otherwise noted. The Court follows the parties' and the Bankruptcy Court's convention in referring to the uniquely-numbered exhibits submitted in various proceedings below as "Trial Ex."

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/19/11

hardware and utilized air handling units ("AHUs") to keep the rooms containing the hardware ventilated. At some point in 2000, the Data Center's Colorado-based senior leadership, to whom the parties refer as the "governance people," informed Raymond Brock, the Data Center's building manager, that the Data Center needed additional AHUs.[2] (Trial Ex. 37, 26:24-28:24.)

Brock contacted a Waldinger manager, Michael Smearman, regarding the project because Waldinger had done work for the Data Center in the past. On September 15, 2000, Waldinger submitted a proposal addressed to Brock at the Data Center offering to sell *and* install three new AHUs – numbered 6, 7, and 43 – and upgrade existing AHU number 5 for a total quoted price of $1,098,000. (*See* Trial Ex. 1.) Waldinger subsequently provided a breakdown of the project, indicating that the purchase price of the AHUs alone was $576,322. (*See* Trial Ex. 4.) Brock forwarded the proposal to the "governance people" in Colorado, who had the authority to issue purchase orders. (Trial Ex. 37, 30:6-9.) On November 14, 2000, WorldCom Purchasing, LLC issued a written purchase order to Waldinger in the amount of $576,000 for the *purchase* of the three AHUs referenced in the proposal. (Trial Ex. 2.) The purchase order did not reference *installation* of the AHUs.

During the fall and winter of 2000-2001, Brock provided access to Waldinger employees to work on existing AHUs at the Data Center, including AHUs 5 and 24. Around March or April 2001, Waldinger began preparing the Data Center for the delivery and installation of the three new AHUs. Waldinger constructed elevated "housekeeping pads" on which to place the new AHUs and installed sheet metal, duct work, and piping. Brock did not tell any Waldinger employee that they were authorized to perform this preparation work. However, Brock admitted that he instructed either Smearman or Waldinger foreman George Russell to work on AHU 5, as directed by the "governance people." Russell stated that Brock also authorized him to move a water line and a "control airline," and to allow a hole to be opened in a concrete block wall so that sheet metal ductwork could be installed. (Trial Ex. 34, 5:1-8:23.)

The three AHUs referenced in the November 14, 2000 purchase order were delivered to the Data Center in July 2001. Waldinger rented a crane and forklifts to offload and move the AHUs to the concrete pads. But when Brock informed one of the "governance people," Arnold Espinosa, that Waldinger was finishing the installation, Espinosa told Brock that WorldCom issued a purchase order only to purchase the AHUs from Waldinger, not to install them. Subsequently, in either July or September 2001, at Espinosa's direction, Brock instructed Waldinger to stop the installation work. (*See* Trial Ex. 37, 58:6–11; Trial Ex. 36, 65:9–11.)

Waldinger submitted three applications for payment to WorldCom. The first application, issued on June 5, 2001, requested payment of $483,500, with a line item designating $223,053 of that amount to the purchase of the AHUs. WorldCom paid the full $483,500 on or about July 27, 2001. Waldinger issued the second application on July 6, 2001, requesting an additional $51,879 for sheet metal and concrete work, but without specifying the project to which the work was related. WorldCom paid the second application on or about October 30,

---

[2] The generally unidentified "governance people" remotely monitored the Data Center and planned its operations.

2001. Finally, on August 2, 2001, Waldinger issued the third application for payment of $411,983, with a $353,279 line item for the outstanding balance on the purchase price of the three AHUs. The remaining items in the application reflected other work Waldinger claimed it performed at the Data Center. On October 15, 2001, WorldCom paid $40,621 toward the third application for a total of $576,000, equalling the purchase price for the AHUs set forth in the November 14, 2000 purchase order.

On October 29, 2001, two weeks after WorldCom's last payment, Waldinger filed a construction lien on the Data Center property pursuant to the Nebraska Construction Lien Act, Neb. Rev. Stat § 52–125, *et seq.* Subsequently, on January 29, 2002, Waldinger brought an action against WorldCom in Nebraska state court, asserting claims for breach of contract and *quantum meruit.* WorldCom removed the action to federal court and the parties reached a settlement agreement to complete the installation of the AHUs under a new purchase order. Soon after the settlement, however, WorldCom filed for bankruptcy, and neither party fulfilled the terms of the agreement.

B.   The Bankruptcy Proceedings

On July 21, 2002, WorldCom filed petitions under Chapter 11 of the Bankruptcy Code. Thereafter, Waldinger filed a proof of claim as a secured creditor in the amount of $371,362 plus interest and attorney's fees (the "Claim"). On October 31, 2003, the Bankruptcy Court confirmed WorldCom's Joint Plan of Reorganization, which became effective on April 20, 2004. WorldCom then filed an objection to the Claim, seeking to expunge and disallow it on the grounds that it was disputed and unsecured, and subsequently moved for

partial summary judgment. The Bankruptcy Court granted that motion on February 23, 2007. *See In re WorldCom, Inc.*, No. 02–13533 (AJG), 362 B.R. 96 (Bankr. S.D.N.Y. Feb. 23, 2007). Without passing on the threshold validity of Waldinger's construction lien, the Bankruptcy Court held that the lien had lapsed and, therefore, Waldinger's Claim was unsecured.

Waldinger timely moved the Bankruptcy Court for reconsideration. After holding a trial on December 13, 2007, the Bankruptcy Court reversed itself on the lapse issue. *See In re WorldCom, Inc.*, 382 B.R. 610, 622-623 (Bankr. S.D.N.Y. 2008). However, the Bankruptcy Court concluded that the parties did not enter into a contract for the installation work, rendering Waldinger's lien invalid under Nebraska law and its Claim, therefore, unsecured. *Id.* at 629. It also held that Waldinger could not recover prejudgment interest or attorney's fees. *Id.* Nevertheless, the Bankruptcy Court found that Waldinger was entitled to an unsecured claim based on a *quantum meruit* theory for the reasonable value of its services, and scheduled a hearing to determine this amount. *Id.* at 631. These rulings were entered in an Order dated March 19, 2008. *See In re WorldCom, Inc.*, No. 02–13533 (AJG), Doc. No. 19261 (Bankr. S.D.N.Y. Mar. 19, 2008.)

Following a June 17, 2009 hearing, the Bankruptcy Court found the reasonable value of Waldinger's uncompensated services was $179,548.27. A final order was entered on October 16, 2009. *See In re WorldCom, Inc.*, No. 02–13533 (AJG), Doc. No. 19483 (Bankr. S.D.N.Y. Oct. 16, 2009.)

On November 19, 2009, Waldinger appealed from both, the March 19, 2008 Order and the October 16, 2009 Order. The

appeal was fully briefed as of January 19, 2010.

## II.   STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 158(a)(1), district courts are vested with jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy courts.  A district court evaluates a bankruptcy court's findings of fact for clear error and its conclusions of law *de novo*.  *In re Bennett Funding Group, Inc.*, 146 F.3d 136, 138 (2d Cir. 1998).  On appeal, "the district court . . . may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings."  Fed. R. Bankr. P. 8013.

## III.   DISCUSSION

Waldinger has designated fourteen overlapping issues on appeal, which can be reduced to five distinct questions:  (1) whether the Bankruptcy Court erred in determining that Waldinger did not have a valid construction lien; (2) whether the doctrine of equitable estoppel barred WorldCom from arguing that Waldinger was not entitled to be paid in full on its Claim and from challenging the amount and obligation of the Claim; (3) whether Waldinger was entitled to an adverse inference because WorldCom failed to make material witnesses available at unspecified proceedings; (4) whether the Bankruptcy Court erred in excluding profit, overhead, and the project manager's salary from the *quantum meruit* award; and (5) whether Waldinger is entitled to recover prejudgment interest pursuant to Nebraska law.  The Court addresses each issue in turn.

### A.   The Construction Lien

The "basic federal rule" in bankruptcy is that state law generally governs the substance and scope of the underlying claims.  *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000) (quoting *Butner v. United States*, 440 U.S. 48, 57 (1979)).  The Bankruptcy Court applied Nebraska law to Waldinger's claims without objection from the parties, and the Court does so here as well.

In order to have a valid construction lien under Nebraska law, the parties must have entered into a "real estate improvement contract."  *Tilt-Up Concrete, Inc. v. Star City/Fed., Inc.*, 582 N.W.2d 604, 610 (Neb. 1998); *see Mid-Am. Maint. v. Bill Morris Ford*, 442 N.W.2d 869, 871 (Neb. 1989).  A real estate improvement contract is "an agreement to perform services, including labor, or to furnish materials for the purpose of producing a change in the physical condition of land or of a structure."  *Tilt-Up Concrete*, 582 N.W.2d at 610 (quoting Neb. Rev. Stat. § 52-130).  The existence of a contract, whether written or oral, may be proven by circumstantial evidence.  *Id.*  A contract is created upon an offer and an acceptance, and requires a meeting of the minds or a binding mutual understanding between the parties to the contract.  *Id.*  "Mutual assent to a contract is determined by the objective manifestations of intent by the parties, not by their subjective statements of intent."  *Id.* (citations omitted).

The existence of a contract is a question of fact reviewed for clear error.  *See Gerhold Concrete Co. v. St. Paul Fire & Marine Ins. Co.*, 695 N.W.2d 665, 670, 672 (Neb. 2005).  The Court may not upset the Bankruptcy Court's factual findings in this regard unless it has a "definite and firm conviction that a mistake has been

4

committed." *Vasquez v. GMD Shipyard Corp.*, 582 F.3d 293, 297 (2d Cir. 2009) (internal quotations and citations omitted); *see also* Fed. R. Bankr. P. 8013 ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."). Appellant bears the burden of demonstrating clear error. *In re Ciena Capital LLC*, 440 B.R. 47, 52 (S.D.N.Y. 2010).

Upon review of the record, the Court finds no clear error in the Bankruptcy Court's determination that the parties did not enter into a real estate improvement contract for the installation of the three AHUs and upgrades on AHU 5. In the absence of evidence of any written or oral assent by WorldCom employees with the authority to bind WorldCom to the entire proposal, Waldinger continues to press that the "silence and acquiescence of WorldCom as to the work performed by Waldinger after submission of the requested proposal was a manifestation of the existence of a real estate improvement contract with respect to all other work performed." (Appellant's Br. 35-36); *see In re WorldCom, Inc.*, 382 B.R. at 626 (noting that this argument formed Waldinger's "main contention" in its trial briefs). As the Bankruptcy Court correctly noted, however, WorldCom did not stay "silent" or otherwise assent to Waldinger's proposal. To the contrary, it responded by issuing a purchase order for only the purchase of three AHUs at a specified cost of $192,000 each, without any indication that it assented to an additional $500,000 in costs for the AHUs' installation and upgrades for AHU 5. (*See* Trial Ex. 2.)

Likewise, the Court finds no clear error with the Bankruptcy Court's finding that the Colorado-based "governance people" did not authorize Brock to take any action with respect to the September 15, 2001 proposal. (Trial Ex. 37, 30:10-13.) Although Brock testified in a deposition that he sent the proposal and payment applications to the "governance people" and that they called to ask him about the status of various AHU projects (Trial Ex. 37, 30:6-9, 43:23-44:23, 45:20-46:6), his recollection was that there were multiple projects and the details related to each project "ran together" in his mind (*Id.* 46:21-23.) After the AHUs arrived on site, Brock's superior, Espinosa, called Brock to tell him that Waldinger only had purchase orders to purchase the three AHUs and not to install them. (*Id.* 58:5-10.) When Brock replied that Waldinger was going to "finish the installation" of the three AHUs, Espinosa asked what Brock meant. (*Id.* at 58:23–59:7.) The presence of Waldinger employees at the Data Center did not clearly establish that WorldCom's "governance people" knew about and failed to voice objections to the installation work. *See In re WorldCom, Inc.*, 382 B.R. at 628 (distinguishing *Tilt–Up Concrete*, 582 N.W.2d at 611). For instance, John Wilhelmi, President of Waldinger's Omaha branch, stated that his workers had been present "almost continuously" at the Data Center working on other projects as well. (December 13, 2007 Tr. 60:21-61:2.)

While Brock provided access to Waldinger employees to begin the installation work, the record does not indicate that Brock had the authority to bind WorldCom to a contract (*see* Trial Ex. 34:4-6, 37, 32:24-25; 40:1-19), or that anyone from Waldinger believed him to have that authority. *See In re WorldCom*, 382 B.R. at 628 (noting that unlike in *Tilt-Up Concrete*, no party who could bind the Debtors to a contract "observed progress being made without voicing objections.") Moreover, the

Bankruptcy Court credited Brock's deposition testimony that he never told any employee of Waldinger that Waldinger had been authorized to install the AHUs. *In re WorldCom, Inc.*, 382 B.R. at 615 (citing Trial Ex. 37, 49:9–18, 64:5–9). Appellant has not presented sufficient evidence to overturn that credibility determination.

As it did before the Bankruptcy Court, Waldinger again argues that WorldCom's payments-in-full on two of the three applications demonstrated WorldCom's earlier acquiescence to the entire proposal. (Appellant's Br. 37.) However, the Bankruptcy Court did not clearly err in finding that the applications were inconclusive in this regard. Although the applications stated that the "Original Contract Sum" was $1,098,000, and contained line items for work unrelated to the purchase of the AHUs, they also directly referenced the November 14, 2000 purchase order in the "contract date" and "purchase order" fields. (*See* Trial Ex. 7.) It is sufficiently plausible that the WorldCom personnel who paid the applications simply believed that they were making payments on the November 14, 2000 purchase order without intending to pay for the specific services in the line items. The fact that WorldCom stopped payment upon reaching that purchase order's exact $576,000 amount further contradicts any *ex post* inferences Waldinger seeks to draw from the payment history.

Waldinger argues that the Bankruptcy Court's conclusions are "inconsistent with [its] findings that WorldCom did in fact specifically authorize and direct Waldinger to complete all of the work on AHU 5 and authorized the necessary preparatory work." (Appellant's Br. 29.) This argument is based on a mischaracterization of the Bankruptcy Court's ruling. While the

Bankruptcy Court stated that "the best Waldinger can show is that Brock did ask about moving a water line well in advance of the arrival of the three AHU's and that Brock did ask Waldinger to do work on existing [AHU 5]," it did not hold that WorldCom employees with contracting authority directly authorized Waldinger to work on AHU 5 or that they authorized all the preparation work. The record bears out that the "governance people" told Brock to "get the work done" on AHU 5, making the issue of whether a contract was formed for upgrading AHU 5 a close call. *In re WorldCom, Inc.*, 382 B.R. at 615; (*see* Trial Ex. 37, 47:8-18.) However, so long as the factual findings of the bankruptcy court are "plausible in light of the record viewed in its entirety," this Court "may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.*

With those principles in mind, the Court finds no clear error in Judge Gonzalez's factual finding that that no contract was formed as to AHU 5. As noted above, Waldinger did not receive a purchase order for work on AHU 5. Moreover, the evidence does not suggest that Waldinger believed Brock to have the requisite authority to bind WorldCom to a contract, or that Brock specifically told Waldinger that the "governance people" accepted its proposal to work on AHU 5. The record further is devoid of the type of interactions between the "governance people" and Waldinger that would demonstrate the parties' objective manifestations to form a contract. *Cf. Tilt-Up Concrete*, 582 N.W.2d at 611 (objective manifestations of contract

formation existed where the offeree's president directly instructed the offeror construction company to begin work under its proposal, announced the company as the official contractor at a public groundbreaking, and observed and expressed his pleasure with the progress.) Accordingly, it was not clear error for the Bankruptcy Court to conclude that Brock's requests did not demonstrate WorldCom's assent to Waldinger's proposal.

Having considered Waldinger's remaining arguments and found that they do not demonstrate clear error, the Court affirms the Bankruptcy Court's finding that WorldCom and Waldinger did not enter into an installation contract.[3]   Because "a construction lien is not valid absent a contract between the parties," *Tilt-Up Concrete*, 582 N.W.2d at 610, Waldinger's October 29, 2001 lien cannot serve as the basis for a secured claim.

### B.   Equitable Estoppel

Waldinger argues that because WorldCom knowingly allowed it to perform substantial work and incur costs, WorldCom should have been equitably estopped from denying the existence of a contract for the installation of AHUs 6, 7, and 43, and the upgrade of AHU 5.   (*See* Appellant's Br. 40.)

The Bankruptcy Court's analysis of equitable estoppel is reviewed for abuse of discretion. *See In re Chateaugay Corp.*, 156 B.R. 391, 403 n.16 (S.D.N.Y. 1993) ("The application of the concept of equitable

estoppel lies in a court's sound discretion which, for the reasons that follow, was properly exercised here.") (citing *Societe Generale v. Fed. Ins. Co.*, 856 F.2d 461, 467 (2d Cir. 1988)); *Sunbeam Prods., Inc. v. Wing Shing Prods. (BVI), Ltd.*, 311 B.R. 378, 395 (S.D.N.Y. 2004).   In this case, the Court finds that the Bankruptcy Court acted well within its discretion in determining that under Nebraska law, the circumstances did not warrant equitable relief.

Nebraska courts apply a two-part test for the application of equitable estoppel, with distinct requirements for both the moving and non-moving parties.   *See Mogensen v. Mogensen*, 729 N.W.2d 44, 51-52 (Neb. 2007).   As to the party being estopped, Nebraska law requires:

> (1) conduct which amounts to a false representation or concealment of material facts, or at least which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) knowledge, actual or constructive, of the real facts.

*Id.* at 51.

As to the party asserting estoppel, the court must find:

> (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (3) action or inaction based thereon of such a character as

---

[3] For example, the Court is unpersuaded that the parties' settlement agreement confirms the existence of an original contract.   The settlement agreement was executed almost a year after Waldinger stopped work on the AHUs and contains no admission of liability on WorldCom's part.

to change the position or status of the party claiming the estoppel, to his or her injury, detriment, or prejudice.

*Id.* at 51-52.  Moreover, the party asserting estoppel must prove these elements by clear and convincing evidence, which is "that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved." *Agrex, Inc. v. City of Superior*, 581 N.W.2d 428, 434 (Neb. Ct. App. 1998) (citing *In re Interest of Joshua M. et al.*, 558 N.W.2d 548 (1997)).  "Equitable estoppel will lie only where the party asserting estoppel does not have the same knowledge of the facts that the party being estopped has, and does not have the ability to ascertain or is not chargeable with notice of those facts." *Id.* at 436 (citing *Commerce Sav. Scottsbluff v. F.H. Schafer Elev.*, 436 N.W.2d 151 (Neb. 1989)).

In support of its equitable estoppel argument, Waldinger asserts that: (1) WorldCom "knowingly allowed" Waldinger to perform substantial preparation work; (2) WorldCom did not instruct Waldinger to stop that work until after delivery of the AHUs; and (3) WorldCom paid the applications for payment without contest and did not claim they were only paying for the purchase of the AHUs. (Appellant's Br. 40.)

Waldinger's attempt to recast its contract arguments into the language of equitable estoppel fails because Waldinger cannot show that it lacked knowledge or that it was unable to ascertain otherwise unknown facts. Waldinger received a limited purchase order from WorldCom for an amount $500,000 less than Waldinger's opening proposal. The purchase order itself had the name, telephone number, and email address of the "Procurement Contact," Jason Stabler,

giving Waldinger ample means to clarify any ambiguities as to the scope of WorldCom's assent.  Without doing so, Waldinger commenced work on the entire proposal.  Accordingly, the Court finds that the Bankruptcy Court did not abuse its discretion by finding that the equitable estoppel doctrine did not apply here.

### C.   Adverse Inference

Waldinger thinly argues that the Bankruptcy Court should have drawn certain adverse inferences from the failure of "Debtors to appear and testify" at either the December 13, 2007 trial or the June 17, 2009 hearing. (Appellant's Br. 41.)  A factfinder is permitted to "draw an adverse inference against a party failing to call a witness when the witness's testimony would be material and the witness is peculiarly within the control of that party." *United States v. Caccia*, 122 F.3d 136, 138 (2d Cir. 1997).  The Court reviews the Bankruptcy Court's decision not to draw an adverse inference for abuse of discretion. *See In re CBI Holding Co.*, 529 F.3d 432, 450 n.7 (2d Cir. 2008).

Here, Waldinger makes no effort to identify any witness that WorldCom did not produce, much less explain the materiality of their testimony or why they were unavailable to Waldinger.  Accordingly, the Court finds that the Bankruptcy Court did not abuse its discretion in declining to grant Appellees request for an adverse inference at the trial or hearing.

### D.   *Quantum Meruit* Calculation

The parties do not dispute that in the absence of a valid contract, Waldinger is entitled to recover the reasonable value of its services under a *quantum meruit* theory. Instead, the salient issue on appeal is

whether the Bankruptcy Court erred in its calculation of Waldinger's *quantum meruit* award following the June 17, 2009 hearing.

*Quantum meruit* is a quasi-contract "theory of recovery based on the equitable doctrine that one will not be allowed to profit or enrich oneself unjustly at the expense of another." *Tracy v. Tracy*, 581 N.W.2d 96, 101 (Neb. Ct. App. 1998); *see also Prof'l Recruiters, Inc. v. Oliver*, 456 N.W.2d 103, 108 (Neb. 1990). "[W]here benefits have been received and retained under such circumstances that it would be inequitable and unconscionable to permit the party receiving them to avoid payment therefor, the law requires the party receiving and retaining the benefits to pay their reasonable value." *Prof'l Recruiters*, 456 N.W.2d at 108. Under Nebraska law, "'[t]here is no specific standard by which such reasonable value is to be determined.'" *S.A. Sorenson Constr. Co. v. Broyhill*, 85 N.W.2d 898, 903 (Neb. 1957) (quoting *Umberger v. Sankey*, 50 N.W.2d 346, 349 (Neb. 1950)). When calculating "reasonable value," a court can look to "all reasonable inferences of value that flow from the evidence adduced." *Tracy*, 581 N.W.2d at 102 (citing *In re Estate of Krueger*, 455 N.W.2d 809, 814 (Neb. 1990)); *see Bosle v. Luebs*, 98 N.W.2d 795, 799 (Neb. 1959). Because the calculation of the *quantum meruit* award is a finding of fact, it is reviewed for clear error. *See In re Louis Frey Co.*, Nos. 06 Civ. 7587, 06 Civ. 7588 (RMB), 2007 WL 924206, at *7 (S.D.N.Y. Mar. 26, 2007).

At the *quantum meruit* hearing held on June 17, 2009, Wilhelmi presented two methods to calculate the reasonable value of Waldinger's work. The first method aggregated (1) Waldinger's actual materials and labor costs, (2) the pro-rated salary of its project manager, based on the estimated time he spent on the AHU installation, and (3) Waldinger's overhead and profit as drawn from data in an industry manual. The proposed reasonable value of Waldinger's work under this method was $992,417.43. Alternatively, under the second method, Wilhelmi referred to the prices listed in the industry manual for the materials, labor, and equipment used by Waldinger, as well as the manual's valuation of a project manager, overhead, and profit. Under the second method, the total value of Waldinger's services was $1,005,758.78.

The Bankruptcy Court first determined that the reasonable value of Waldinger's entire work on the project was $755,548.27 based on Waldinger's actual materials and labor costs, including the cost of the three AHUs themselves. *See In re WorldCom, Inc.*, No. 02–11533 (AJG), 2009 WL 2959287, at **7-8 (Bankr. S.D.N.Y. Aug. 18, 2008). This total excluded the project manager's salary and Waldinger's proposed profit and overhead from the industry manual. *Id.* The Bankruptcy Court then deducted the $576,000 already paid to Waldinger to arrive at an unsecured *quantum meruit* claim in the amount of $179,548.27. *Id.* at *8.

The Court finds that the Bankruptcy Court erred in its methodology. It is undisputed that Waldinger had a valid contract with WorldCom for the purchase of the three AHUs. *See In re WorldCom, Inc.*, 382 B.R. at 626-27. That contract and payments under it should not have been included within the calculation of Waldinger's services in quasi-contract. The consequence of doing so is that Waldinger's legitimate profit on the AHU purchase order – approximately $10,000 – was improperly counted against the *quantum meruit* claim. Instead, the reasonable value of Waldinger's quasi-contract work should be based on its

actual costs for installing the AHUs and upgrading AHU 5. Accordingly, the Court finds that the reasonable value for these services, based on Waldinger's actual costs, is $188,927.96. The Court arrives at this number by adding Waldinger's $60,668.37 in "mechanical costs" and $128,259.59 in "sheet metal costs." (*See* Trial Exs. 44, 45.)

The Bankruptcy Court's remaining factual analysis was not clearly erroneous. Specifically, the Bankruptcy Court did not err in excluding the project manager's salary from the award. The record reflects that aside from Wilhelmi's rough estimation that the project manager spent 25% of his time on the installation of the AHUs, Waldinger did not produce sufficient evidence to substantiate the figure. At trial, Wilhelmi testified that the basis for his estimate was simply his "37 years in the construction business . . . watching project managers, and how they work, and what they do." (June 17, 2009 Tr. at 77:8-9.)

Likewise, the exclusion of Waldinger's overhead was not clear error. Relying on data entirely from the industry manual, Waldinger did not connect its proposed overhead calculation with Waldinger's "actual costs associated with the installation of the AHUs or work on Unit 5." *In re WorldCom, Inc.*, 2009 WL 2959287, at *8. In fact, Wilhelmi testified that Waldinger never actually used the industry manual to bid a job. (*See* June 17, 2009 Tr. at 78:18.)

Finally, the Bankruptcy Court determined that Waldinger was not entitled to any profit on its *quantum meruit* claim. The Court reviews this conclusion of law *de novo*. Nebraska courts generally do not allow recovery of profits in *quantum meruit* cases. *See Gee v. City of Sutton*, 31 N.W.2d 747, 751 (Neb. 1948). "Generally, the courts will not allow profits which might have been obtained if the contract had been legal and valid, and if recovery were had according to its terms, but confine[] recovery to such sum as will reasonably compensate the party whose services or property have been devoted to the advantage of the other." *Gee*, 31 N.W.2d at 751; *see also Lanphier v. Omaha Pub. Power Dist.*, 417 N.W.2d 17, 23 (Neb. 1987) (quoting *Gee*, 31 N.W.2d at 751). Although Waldinger is correct in noting that the cases cited involved municipal corporations and political subdivisions, there is no reason to believe that this principle is limited to those facts, considering that, in *quantum meruit* recovery, the "principle applied is that of reimbursement; and the plaintiff can only recover the actual cost of the services rendered and material furnished without the allowance of profits . . . ." *Gee*, 31 N.W.2d at 751.

Waldinger relies on *Tilt-Up Concrete* and *Fru-Con Const. Corp. v. Controlled Air, Inc.*, 574 F.3d 527, 534 (8th Cir. 2009), for the proposition that a "contractor is entitled to a reasonable profit on the work performed that is secured by a construction lien, even though the profit is limited to the extent that it may be considered compensation for services actually rendered, as distinguished from the amount of the contractor's loss because of an owner's breach of contract." (Appellant's Br. 46 (quoting *Tilt-Up Concrete*, 582 N.W.2d at 615)). But unlike in *Tilt-Up Concrete*, there was no valid construction lien securing the work here because there was no contract for the installation or the upgrade. *See* Part III.A, *supra*. Furthermore, even if Nebraska law allowed the recovery of profits in *quantum meruit* cases absent a valid construction lien, the Court finds that Waldinger did not offer sufficient evidence that its profits of $90,219.77 are reasonable, because they were derived entirely from an industry

manual. *See In re WorldCom, Inc.*, 2009 WL 2959287, at *6. As noted above, the profit formulas were not used by Waldinger to bid for projects, and bear little relation to Waldinger's actual services rendered in this matter.

Thus, taking into account the modification of the *quantum meruit* award above, the Court finds that Waldinger is entitled to an award of $188,927.96.

### E. Statutory Interest

Finally, Waldinger argues that it is entitled to recover prejudgment interest at the statutory rate of 12% per annum pursuant to Nebraska state law. (*See* Appellant's Br. 47.) The Court reviews this issue *de novo*.

Prejudgment interest is allowed at a rate of 12% per annum under two situations, only one of which is relevant to this appeal. The relevant Nebraska statute provides that interest "shall accrue on the unpaid balance of liquidated claims from the date the cause of action arose until the entry of judgment." Neb. Rev. Stat. § 45-103.2(2). A claim is liquidated "when no reasonable controversy exists to either the plaintiff's right to recover or the amount." *Gerhold Concrete Co.*, 695 N.W.2d at 673. Generally, prejudgment interest is not allowed for a *quantum meruit* claim. *See Ritzau v. Wiebe Constr. Co.*, 214 N.W.2d 244, 248 (Neb. 1974); *Lundt v. Parsons Constr. Co.*, 150 N.W.2d 108, 112 (Neb. 1967).

Waldinger again relies on the line-item designations in the first and second payment applications to demonstrate that the $576,000 paid by WorldCom did not go entirely toward the purchase of the AHUs. (*See* Appellant's Br. 47-48.) Based on that reasoning, Waldinger claims that the third

application had an outstanding balance of $353,279 toward the November 14, 2000 purchase order and that its recovery of that sum under contract was certain beyond controversy. *Id.* However, as explained above, the Court finds that WorldCom did not acquiesce to paying for the services listed in Waldinger's specific line item designations, but rather made payments toward the November 14, 2000 purchase order expressly referenced in the applications. Accordingly, in light of the considerable controversy existing as to Waldinger's amount of recovery on its *quantum meruit* claim, the Court finds that Waldinger is not entitled to prejudgment interest.

### IV. CONCLUSION

For the foregoing reasons, the Court affirms the Bankruptcy Court's March 19, 2008 Order. The Court affirms in part and modifies in part the Bankruptcy Court's October 16, 2009 Order and finds that Waldinger has an unsecured *quantum meruit* claim in the amount of $188,927.96. The Clerk of the Court is respectfully directed to terminate any pending motions and close this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: April 18, 2011
New York, New York

\* \* \*

Appellant is represented by James Bernard Cavanagh, Lieben, Whitted, Houghton, Slowiaczek & Cavanagh, P.C., L.L., 100

11

Scoular Building, 2027 Dodge Street, 3rd
Floor, Omaha, NE 68102 and Bennette
Deacy Kramer, Schlam Stone & Dolan LLP,
26 Broadway, New York, NY 10004.
Appellees are represented by Mark S.
Carder, Stinson Morrison Hecker LLP, 12
Corporate Woods, 10975 Benson, Suite 550,
Overland Park, KS 66210.